Mr. Hayes, we're familiar with the cases you rely on, so just give us your best argument. When the light turns red, please finish your sentence. All right. The first case is Alcoa v. NLRB. Mr. Hayes. Good morning. May it please the Court, my name is Brian Hayes, and I represent the petitioners in this case, Alcoa, Incorporated, and Traco Windows. Seated with me at council table is my co-counsel, Mr. Thomas Smock. Your Honors, under the National Labor Relations Act, an employer may be required to relinquish its property rights to allow limited access to its property by its own off-duty employees and off-site employees. In the present matter, however, the National Labor Relations Board seeks to compel petitioner Traco Windows to provide such legally-mandated employee access to individuals that Traco did not hire and cannot fire, that Traco does not direct, nor Traco determined any of the wages, hours, working conditions, or other terms and conditions of employment for those individuals, to provide such access to individuals that do not work in a Traco facility, do not work alongside a Traco employee, and in every real sense of the word, are complete strangers to both Traco and to Traco's employees. The decision and order in this case actually sweeps far more broadly than simply Traco and this isolated incident. Indeed, if you follow the logic of the Board's decision and order in this case, what they are effectively saying is some 61,000 employees who work for Alcoa, Incorporated, or one of its more than 300 subsidiary companies would have employee access rights at not only Traco, but a hundred other U.S.-based subsidiaries of Alcoa, Incorporated. That's a rather startling result, and the Board reaches that by concluding that Alcoa, Incorporated and Traco Windows are a quote-unquote single employer. However, that single employer finding is predicated on, in our view, nothing more than the common everyday interchange and interaction that occurs all the time between a parent corporation and its subsidiaries. Indeed, if on this record Alcoa and Traco are a single employer, I would submit that most corporations, most parent corporations and their subsidiary corporations in the United States are also single employers. I don't think that's the result here, and I think that the result is wrong because of two fundamental flaws in the Board's decision and order. First of all, the record evidence in the case simply does not support a finding of single employer under the law in this circuit or in any other, for that matter, or even under the Board's own precedent. And second, the Board in this case seeks to apply the single employer construct in a manner which it has never been applied by any federal court or by the Board itself in the 80 years that the National Labor Relations Act has been in existence. Yet it does so here without a word of explanation as to why that is appropriate. And indeed, I would submit that it is not appropriate at all. Let me turn to the first of these errors. And this matter has been briefed, I think, extensively, so I will try to deal with it in as summary fashion as I possibly can. Let me note at the outset that it really bears noting that under federal law there is a strong presumption that a parent corporation and its subsidiary are not a single employer and that any finding that the two are a single employer is the exception, not the rule. Now, that exception can be predicated on the existence of four factors that the Board and the courts typically refer to.  The first of which is the control of labor relations by a parent of its subsidiary. In this instance, the Board finds that TRACO's labor relations are pervasively controlled by ALCOA, Inc. Let me begin by noting what's not in this record. First of all... I'm not sure that will be helpful. If it's not in the record, we don't need to know it. Well, I think, if I might, Your Honor, the point I would make only is this, that there is nothing in the record and there is no finding by the Board that ALCOA, Inc. plays any role whatsoever in determining the wages, hours, working conditions, terms or conditions of employment of any employee at TRACO. And similarly, there is nothing in the record, nor is there any finding, that TRACO determines the wages, hours, working conditions or any term or condition of employment for any employee that works for ALCOA, Inc. I think that that absence of that evidence and the absence of that finding is, Your Honor, with respect, significant in this case. Simply because the law in this circuit and in others, and indeed the Board's own precedent, suggests that control of labor relations really talks about whether a parent corporation can control all those incidents of employment that I just listed for the employees in the subsidiary corporation. We note, with respect to each and every case that the Board has cited for the proposition that the record here shows that ALCOA controls the labor relations of TRACO, that in each and every one of them, the parent corporation controlled the process by which wages, hours, working conditions for subsidiary employees were determined. That's not present here. What the Board principally relies on for its conclusion in this case is a single isolated incident occurring back in September of 2011. In that instance, the union which represents ALCOA employees at a different ALCOA plan contacted ALCOA, not TRACO, contacted ALCOA and said that the next day, ALCOA employees attended to seek access to TRACO property for the purposes of handbilling, union handbilling. The ALCOA's attorneys determined that that was not appropriate and so advised the union. They also consulted with the management at TRACO. The next day, two employees, one from an ALCOA plant in Lafayette, Indiana, and one from an ALCOA plant in Davenport, Iowa, sought access to the property of TRACO in Cranberry, Pennsylvania. That access was denied. It is on that incident largely that the Board predicates the conclusion that ALCOA somehow controls the labor relations of TRACO. What about the handbook that says, talks and speaks in terms of ALCOA and says it's ALCOA's policy that non-union labor force is better for everybody? That's true, Your Honor. Whether that rises to the level in the context of Board and Circuit precedent of controlling labor relations I think is a bridge pretty far. That ALCOA would, ALCOA's statement with respect to unions in a handbook is something that is protected by the National Labor Relations Act. And there's nothing that suggests that ALCOA, that TRACO is not free to conduct its labor relations with its own employees or with any union that they might have in any manner that they see fit. Doesn't it also say that the handbook directs employees to report any violations of standards to ALCOA's general counsel? That's correct. It does. In other words, any, there are ethical norms that ALCOA applies to all its subsidiaries, to the conduct of business by all of its subsidiaries. And if, in fact, there are transgressions that anybody who works in any of the subsidiaries that sees, with respect to the ethical norms that ALCOA insists upon, yes, there is a procedure for employees to report that. Well, isn't that controlling labor relations? I don't believe so, Your Honor. Why not? Well, I believe that what this circuit has said, if you take a look, for example, at Oak Tree Capital, the most recent case out of this circuit, what we look at in terms of whether or not labor relations are controlled is the grist of the employment relationship. Who decides what people get paid? Who decides if they get hired? Who decides what their vacation is? Who decides what their benefits are? Not is there a process by which employees can report violations to a parent corporation of ethical standards that the parent corporation may promulgate to protect its brand. The incident of September is really nothing more than ALCOA attempting to control the behavior of ALCOA employees. No employee of TRACO was denied access to its own property. No employee of TRACO was denied the opportunity to handbill. The only thing that resulted out of the interchange in September of 2011 was that ALCOA, Inc. employees were not permitted on the property of TRACO. Who made that decision? Well, the Board, I think, makes a leap that that decision was made by ALCOA, Inc. In fact, ALCOA communicated to the union its view that they did not have the right to be on that property. They then consulted with and made that opinion known to the management of their subsidiary. Now, the Board concludes that that demonstrates that ALCOA made the judgment. I would suggest that there's no real evidence on the record or no persuasive evidence on the record as to who made the final call. Well, it wasn't really a consultation, wasn't it, before the ALCOA employee telling our management or whoever it was, the lawyer, telling TRACO about the handbilling? It was more informing them, telling them this is the way it's going to be, not consulting or getting... Well, I don't believe so. I believe the record suggests that what happened was the ALCOA attorneys advised the management and the subsidiary that their position was that ALCOA employees didn't have that right. Now, that's not to say that... And the record does indicate that TRACO is free to take advice or not take advice from ALCOA's attorneys. Well, is there any evidence that they rejected the advice? No. But again, I would return for a moment to the labor relations piece and simply point to the fact that in every case from Oak Tree, Royal Typewriter, Covanta, Pentec, Pathology Institute, in every one of them, the control of labor relations piece is predicated on the fact that the parent company regulated the process by which the wages, hours, and working conditions of the subsidiary's employees were arrived at. That's a fact not present here at all. Let me just quickly shift for one moment to the second argument, and that is that, as I said, never before in the 80 years of the National Labor Relations Act has the board ever tried to apply the single employer construct to grant property rights to individuals who are not the statutory employees of a given employer. Now, the problem is that the board has articulated for this Court no reason why it's appropriate to use the single employer construct in this particular way in this case. I submit to you that it the board refers to is a secondary boycott case. Well, I would suggest that the underlying statutory reasons for that analysis in a secondary boycott case are vastly different than they are in an access case. An access case, unlike a secondary boycott case, requires a balancing of the rights, the property rights of the employer with the Section 7 rights of the employer. Now, the board is not balancing at all in this case. The board merely concluded that, aha, they're a single employer, therefore, that's the same thing as if it's the same employer. They've never said that before, and there's no basis for them to say it here and now. Thank you, sir. You saved some time for rebuttal. May it please the Court. My name is Milakshmi Rajapaksa. I'm counsel for the National Labor Relations Board. I'd like to begin by responding to the company's suggestion that the operative question here is who controls day-to-day labor relations. As this Court said, in Oaktree, which is a case that the company has drawn to the Court's attention today, the fundamental inquiry is whether there exists overall control of critical matters at the policy level. And I would submit to this Court that that fundamental showing has been made on the evidence in this case. Specifically, TRACO's handbook imposes Alcoa's position on unions. It imposes Alcoa's business conduct policies. It instructs employees to report infractions to Alcoa's general counsel. TRACO's safety video imposes Alcoa's safety rules. Alcoa also imposed its very obvious anti-union stance on TRACO in this case, and the judge and the Board reasonably viewed all of the evidence, and most of it, by the way, was provided by the Alcoa Industrial Relations Director, Kevin O'Brien. And that evidence shows that Alcoa has a policy of union avoidance. And essentially, at every turn, it imposed that policy on TRACO. So you see that in the events of September 7th and 8th, 2011. You also see it before then, when Alcoa's Industrial Relations Director instructed TRACO's human resource manager on how to handle union literature that was discovered at the facility. You see it in the period shortly after the hand-billing incident in this case, when Alcoa provided materials on union avoidance for presentation by TRACO managers at a town hall meeting. You see it in the fact that Alcoa trained TRACO's managers for roughly 6 hours on union avoidance, which is Alcoa's policy. So there is a great deal of evidence of control by the parent corporation. Who set the wages and the salaries? And is that a key issue? I would say no, Your Honor. And the reason for that is as follows. In the single employer analysis, and the statement I just quoted identifies this. The issue is not day-to-day control of matters. The issue is critical control of policy — excuse me — control of critical matters at the policy level. What's your best case that's factually similar to this, that does not go off on control of wage, hours, benefits, et cetera? What are your best case, your best three cases? Your Honor, I think I will begin by — I will answer your question, but I will begin by saying each of these single employer cases is so intensely factual. There is not a case — What's the closest one? Name one or three that do not go off on wages, benefits, that sort of thing, and go off on something more like this. I think Pathology Institute, I think Royal Typewriter, Sperlino Materials, those are three very good cases that emphasize that, especially Royal Typewriter, that control of day-to-day matters is not determinative in this area. If you had, for example, a joint employer analysis — What was determinative? What is determinative in those cases? In those cases, it is, again, control of critical matters at the policy level. What were the facts? So in Royal Typewriter, for example, the parent company in that case controlled labor relations in terms of negotiating with unions for the And so in this case, we don't have an established collective bargaining relationship. So when you look at labor relations as relevant in this case, there is no comparable situation where the employer, the parent company, is negotiating with the union. But this union avoidance policy is — I'm just asking, do you have a case that's similar on — that's factually similar? There is no case that involves these facts. Many of the cases involve mature or established collective bargaining relationships, so they are different on their facts. But in this case, the critical issue is, what is the labor relations policy that ALCOA imposed on TRACO? And it is this policy of union avoidance, and that is the comparator that I think exists between this case and the other cases. So that's the only element of control that you have, is the union policy, the labor relations policy? Well, it's also — for labor relations, yes, but there's also, as I said, other aspects of control. There's imposition of rules, safety rules, business conduct policies. I mean, ALCOA is very involved in setting policy generally for this TRACO facility. And so all of that is relevant to the single employer analysis. And the company suggests that what the Board has done — Wouldn't you think that safety rules and ethical conduct would be pretty much the same regardless of — industry-wide, regardless of ownership? I mean — I don't think you can say that from this record, Your Honor. I mean, we have to look at what is in the record. The company is submitting based on no evidence that what it has done in terms of its relationship with its subsidiary in this case is just standard industry practice. But we have no evidence to evaluate that statement. And so what the Board looked at in this case is the evidence in the record, which shows more than the ordinary amount of control. I'm having a hard time conceptually, because the Board has never taken the position that if you haven't the same accounting processes, that your consolidated tax returns, that your SEC filings are all consolidated, that that makes you a single employer. And I don't see that much difference than having globally applicable safety rules and globally ethical conduct than having common accountants. So do you see where I'm headed? I mean, that's the sort of thing that you would expect to be consistent company-wide, and it makes total sense to have a common — a single provider for those sorts of things from an economic standpoint. And that doesn't seem to me to be controlling labor relations. I will say, first of all, that is just one of the sort of cluster of factors that the Board took into account. There were facts relating to control, which I recited, and then there are facts relating to just integration and lack of arm's-length relationships. So I think what Your Honor is referring to is the separate evidence that went to integration of the unified, the centralized services, the accounting department. Courts across the world do not say that makes apparent having control of the subsidiary free. It doesn't on its own. It does not. That shouldn't be factored into it from my perspective, because every global company has those sorts of organizations. Well, the Board — I think the Board looked at this from the perspective of precedent, and under a royal typewriter, cardio data systems. These are cases where there were centralized services, and that was relied upon as one factor to show integration of the operation. It's not that those factors were decisive, but they were relevant in determining whether the two entities, or the two or three or four in the case of royal typewriter, were a single integrated business enterprise. What's also relevant in this case in terms of the centralized services, Your Honor, is the fact that ALCOA did not charge for some of the services that were being provided. That is very probative of lack of arm's length. Which ones? Excuse me? Which services? So, for example, when the industrial relations department consulted with TRACO over the phone, there was — Kevin O'Brien testified that there was no charge for that kind of service. You mean for the advice? Correct. For the advice provided over the phone. Or, Your Honor would say advice. The board would call it direction and guidance. Because, again, ALCOA is imposing its policies on TRACO. So those services were provided free of charge. And in general, I will say, all of the services were charged, quote-unquote charged, by intercompany accounting charges, which were applied by the accounting department to the books that it kept for TRACO. But, again, every company in the United States government, for that matter, does that. I mean, that doesn't seem to me — Well, Your Honor, the board relied on a series of cases — Boulevard Tees, Sperlino Materials, Royal Typewriter, Cardio Data Systems — all of those cases involved a finding of a non-arm's length relationship between a parent and a subsidiary. You can cut checks back and forth. There's no material difference. That's true, Your Honor. And if they were cutting checks back and forth, that would be an entirely different situation. Here, what I think is critical from the board's perspective is the ALCOA accounting department — there is no TRACO accounting department. ALCOA's accounting department applied these charges to books that it kept for TRACO. That is not an arm's length relationship in the board's view. And so that was — according to the board, that was a very relevant piece of information. Because you're saying the charges or the services or the expenses were not negotiated, they were just applied? In other words, there was no invoice and no time to object to the invoice or to take a position that it's too expensive or they're not going to pay it? It was just automatically debited? That is what it appears — what the situation appears to be from this record, Your Honor. And the board looked at all of the evidence and drew what it believed were reasonable inferences from the evidence. In terms of integration, since Judge Owen has expressed some interest in that, I will also say for a period of about a year, there was no TRACO job application. So job applicants applied on an ALCOA application that made no reference to TRACO whatsoever. There are repeated references to the TRACO facility as ALCOA TRACO in the safety video that is in the record. There were repeated references to ALCOA, period, ALCOA, in the TRACO employee handbook. So all of these pieces of evidence the board looked at and considered to be highly relevant on integration of operations and also the evidence also went to control, as I have said. Once the board reviewed all of this evidence and found on the preponderance of the evidence that ALCOA and TRACO are a single integrated enterprise, it determined that they are an employer for purposes of the Act. And then the board just proceeded to apply the Act as it normally would to an employer. And this is where the board's access finding comes into play. Because ALCOA and TRACO are a single employer for purposes of the Act, ALCOA employees are off-site employees in relation to the TRACO facility. And under well-settled board law that has been approved by several courts, off-site employees have a limited right of property access to the exterior non-production areas of a facility that is under the control of their employer. So all the board did was apply that very straightforward rule in this case, and the company claims that the board has opened the floodgates, essentially, to ALCOA's having to basically tolerate access rights at all of its subsidiaries for any employee from any subsidiary or from the case. The board's finding is very much tailored to the facts in the record about ALCOA and TRACO only. This decision has nothing to do with any of the other subsidiaries of ALCOA, and for all we know, they may have a very different more formal relationship with their parent company. So this decision only applies to these two entities and the TRACO facility. It really does not go any further to the extent that ALCOA admittedly has. So the board submits that this is not a sweeping decision. At any time, if the TRACO managers on-site feel that it would compromise safety or any other legitimate concern to have off-site employees on their property, they can present that justification, and if it's legitimate, they can bar access. So this is not at all a sweeping policy that the board has enacted. It's simply the Hillhaven policy that has been on the books for many years. If the court has no further questions for me, the board will rest on its brief as to the undetested issue. All right. Thank you. Good morning. May it please the court, I'm Mariana Padillas for the United Steel, Paper and Forestry, Rubber Manufacturing, Allied Industrial and Service Workers International Union, which I'll refer to as Union. I want to echo counsel for the general counsel's comments about the scope of this case. ALCOA alleges that it's 61,000 employees, 300 subsidiaries. I want to call us back to Lusk, which centralizes the question on the precise issue at hand. Lusk at 777 says that whether the parent corporation was a final decision maker in connection with the employment matters underlying the litigation so here the hand-billing, the off-site employee's access, then all four factors are examined only as they bear on this precise issue. This is echoed in Royal Typewriter, which says that the single employer, which found a single employer status where the parent company showed sufficient participation in unfair labor practices as to require it to remedy them. What the board is seeking to do is hold the parties responsible for the violation of the National Labor Relations Act, to hold them responsible and require them to participate in the remedy. So it's not so much enmeshing a neutral, distant, isolated employer. It's looking at who was an active participant in the decision. Here the active participant was O'Brien with the phone calls. He received the phone call from the union, and then O'Brien himself decided how to move from there. If he'd been outside counsel, would we be in a different place? If he'd represented Alcoa and Traco as outside counsel? Well, I'm not sure O'Brien is an attorney. I think it would be different if O'Brien, after receiving the phone call from the union, instead of consulting his attorneys, calling the union back with his decision, if instead he had received the phone call and then called Traco and said, hey, I heard that this is going to happen, and then Traco would have had the opportunity to exert its control over labor relations and say, oh, we don't know what to do. Can you give us some advice about that? That would have made it more difficult to prove who the critical decision maker was. But what if Traco would have then called Alcoa? Same thing as O'Brien calling Alcoa. I don't think it is the same thing, Your Honor, because I think what it would be doing is offering Traco the opportunity to determine its own labor relations, which is what Alcoa is saying Traco has. What O'Brien did instead was take away Traco's opportunity to make this decision. He made the decision that the Alcoa Inc. employees wouldn't be allowed onto Traco property. Although, as Alcoa employees, and Alcoa makes the argument that he was seeking to control Alcoa employees, so if they had misbehaved or in some way not acted properly while handling on Traco property, presumably they would have been open to Alcoa discipline. So I think looking at Alcoa's allegations about the scope of this decision. Why are we even looking at these other factors if the only thing we're looking at is Alcoa actively co-engaged in anti-union activity, why do we even have to get to the, you're making it sound as if we don't have to look at an employer situation. Well, I apologize for that. I'm just focusing on it because I think it's a critical issue, but I think as the other cases show us, that context is also important. With the four factors, you look at common ownership, you look at common management, you look at interrelation of operations, you look at centralized control of labor relations. If we only had the phone call, it would also be a difficult case because the rest of the four factors would be lacking. Here, in addition to the phone call, which is what bears on this precise issue of the off-site employee access, we also have Alcoa's union avoidance policy, which I think is part of labor relations because even though it's not wages hours in terms and conditions of employment, although I think requiring them to report to the Alcoa Inc.'s general counsel is a term and condition of employment, surely adherence to the National Labor Relations Act is encompassed in labor relations and surely Alcoa Inc.'s employees vet the union avoidance policy to make sure that it doesn't violate the National Labor Relations Act. So I think the other facts that we have here shed light on the context, but we're looking at this precise issue of the hand-billing that occurred on September 8th. We're looking at who made the decision and it was O'Brien. It was enforced by O'Brien on a phone call when the hand-billing was occurring. He said he told the union's attorney his position, not Trako's position. So I think the scope of this is less broad than what Alcoa alleges. Thank you. All right. Thank you. Mr. Hayes, you have 5 minutes rebuttal. Let me ask you, this happened 5 years ago. Has there been any other activity at the Trako plant? Not that I'm aware of, Your Honor. Let me, if I may, just briefly address you asked counsel for the general counsel to indicate a couple of cases that the board presumed to be controlling here. One of them was Sperlino. Just let me briefly note that in Sperlino involved two companies that were owned by the same person who managed both the companies, who had the authority to determine all the incidents of employment for the employees of both of the companies, who conducted the collective bargaining negotiations in both companies. Both of the companies performed exactly the same work, used exactly the same company name, and shared a common website. There was a significant history in both cases that the board notes of permanent and temporary interchange between the two companies without benefit of any application process, and there was continuous day-to-day contact and coordination of work between the two companies. They regularly shifted funds between one another, made loans and advances to each other without agreements, without interest, or without terms, and they paid each other's bills and received combined invoices from third-party vendors. That is in no way even close to the relationship between Traco and Alcoa, Inc. Traco and Alcoa, Inc., there is no evidence that on a temporary or permanent basis they interchange employees. They have no shared equipment, no shared space, no shared accounts. There's no evidence that they perform the same work, that they produce the same products. So what you said, no shared accounts, is there affirmative evidence that they have separate bank accounts? Yes. That there is no evidence that they are part of an integrated production process and no evidence of any work-related contact at all between the employees that work at the Traco facility in Pennsylvania and any of these employees that work in Indiana and Iowa. So if Sperlino stands for the proposition that these individuals should be, or these two companies should be considered a single employer, it frankly escapes me as to what the factual similarities are. The same is true, by the way, of Royal Typewriter. In Royal Typewriter, the Eighth Circuit specifically says that the reason why they should be considered a single employer is because Litton Industries participated in and had quote-unquote clout in the labor negotiations between Royal Typewriter and the union that represented them. In other words, Litton Industries was the prime mover in the very process by which the wages, hours, working conditions and terms and conditions of employment for the Royal Typewriter employees were established. That's not my words. That's the words of the Eighth Circuit and, by the way, of the Board. So neither one of those cases stands for the proposition which the Counsel for the General Counsel has indicated that it does. To return, too, to the question of the fact that there happen to be standardized safety policies or ethics policies, heavens, those requirements are external to the company. OSHA has safety standards. And so it's not unusual for a parent corporation to indicate to its subsidiaries that these are the legally required steps that you're supposed to take with respect to ensuring the safety of employees that work in the facility. We come back to the anti-union policy. Okay. It's in the handbooks. Well, a couple of things. First of all, there is nothing in the record the only evidence in the record is that TRACO was free to accept or to reject the advice and counsel that it might have received from Alcoa. There is nothing that suggests that TRACO was required to establish any particular policy. There's just no evidence in the record of that. The fact that they did is a matter of surmise why they did. They could have reached that conclusion by themselves. But absent that affirmative evidence, even that is not persuasive of the fact that there is any control of labor relations policy. But fundamentally, the fact that they have nothing to do with establishing any of the incidents of employment is what's critical. Thank you. Thank you. We have the argument.